

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0541-24

## WILLIAM TRAVIS KITCHENS, Appellant

### v.

### THE STATE OF TEXAS

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIRST COURT OF APPEALS
### HARRIS COUNTY

PARKER, J., delivered the opinion of the Court in which RICHARDSON, YEARY, NEWELL, KEEL, WALKER, MCCLURE, and FINLEY, JJ., joined. SCHENCK, P.J., filed a dissenting opinion.

## OPINION

In closing argument, the prosecutor suggested that the defendant was "prejudiced" and found the victim to be "scary" because the victim was Hispanic. We conclude that the prosecutor improperly commented on matters outside the record because *no evidence* at trial suggested that the defendant had a prejudice against Hispanics or was motivated to shoot the victim because he was Hispanic. Moreover, even if defense counsel might have implicitly suggested that the victim was dangerous because he was Hispanic, the prosecutor went too far when he suggested that *the*

*defendant* had a prejudice against Hispanics. Consequently, we reverse the judgment of the court

of appeals and remand the case for a harm analysis.

## I. BACKGROUND

### A. The Incident and Past Proceedings

Riding his motorcycle, Hipolito Thomas Desoto, the named victim in this case, pulled up to

William Travis Kitchens's auto shop. Desoto walked in, and a couple of minutes later, Kitchens shot

him. The encounter was recorded on surveillance video, but there was no audio. Between Kitchens

and one of his employees, there was testimony that Desoto came in looking for a machinist; that

Kitchens said, "I can't help you"; and that Desoto, engaging in vulgar language, said that he or

"they" would beat Kitchens's "ass" or "fuck [him] up." Based on this incident, Kitchens was

convicted of murder. Concluding that the trial court erred in failing to submit a "sudden passion"

instruction at the punishment stage of trial,[1] the court of appeals reversed and remanded for a new

punishment trial.[2]

### B. Punishment Trial Before State's Final Closing Argument

Because this case turns on what inferences could be drawn from comments by the defense

and Kitchens about Desoto's appearance, we detail various portions of the record that involve or

relate to such commentary.

### 1. *Voir Dire*

During voir dire at the new punishment trial, defense counsel brought up the topic of

---

[1] *See* TEX. PENAL CODE § 19.02(d).

[2] *Kitchens v. State*, No. 01-18-00518-CR, 2019 WL 6482408, *13–14 (Tex. App.—Houston [1st Dist.] Dec. 3, 2019, pet. ref'd) (mem. op., not designated for publication).

motorcyclists: "Any one of you ride motorcycles? When you see a motorcyclist on the road, anyone have a reaction to it?" A member of the venire answered that they needed to be avoided because, if they fall, they are dangerous. Counsel then asked, "If you see a motorcyclist without a helmet on, does that affect you at all?" Members of the venire remarked that it was an issue if there was an accident, that they are vulnerable, that they are stupid, and that extra care was needed riding around a motorcycle whether or not protective gear was worn. Counsel then asked, "When you hear the word 'bandito and motorcycles,' what do you think about?" Venire members answered, "cartel," "gang member," and "stereotype."

### 2. *Defense Opening Statement*

During opening statement, defense counsel mentioned that Desoto was "a big man, riding a motorcycle, wearing sunglasses and no helmet." Defense counsel also mentioned that Desoto was 5'7" and weighed 280 pounds while Kitchens was 5'5" to 5'7" and weighed 160 pounds, "a big difference in size."

### 3. *Conferences about SYLB and Motorcycle-Club Stickers*

In a motion in limine before testimony, the State requested that the trial court exclude any reference to Desoto being a member of a street gang or an outlaw motorcycle club. Both parties talked about stickers on the motorcycle—one that contained initials and one with the name of a motorcycle club in San Antonio. Defense counsel contended that the initials "SYLB" on one of the stickers stood for "Support Your Local Bandidos."

Later, at a bench conference, defense counsel requested that he be allowed to zoom in on the stickers, tell the jury what they say, and ask questions about the meaning of the stickers. Defense counsel reiterated his interpretation of "SYLB." The trial court repeatedly asked if the defense

would be able to show that Kitchens saw the stickers, but defense counsel avoided answering the question. The trial court ruled that the defense could show the jury a close-up of the stickers but could not elicit testimony about their meaning.

### 3. *The Video of the Incident*

A surveillance video showed the following: Desoto entered Kitchens's business office. Desoto appeared to be a chunky Hispanic male with a substantial beard, dressed in a short-sleeved shirt and shorts, wearing tennis shoes, with sunglasses on top of his head. He spit in a trash can, talked for about 40 seconds, began significant gesturing with his arms and hands while talking for about another 25 seconds, then turned and walked back to the door. He opened the door a crack and then closed it, took something off his left ear and put it into a shirt pocket, and looked back in Kitchens's direction and spoke. Kitchens, previously off-screen, moved onscreen, advanced on Desoto while holding a handgun in both hands, and fired at him multiple times. Desoto fell forward to the ground. Kitchens moved around afterwards with a speed suggesting franticness.

### 4. *Defense Cross-Examination of State's Witnesses*

In cross-examining Corporal Jennifer Martinez, defense counsel described Desoto as "substantially larger" than Kitchens. Counsel also described Desoto as "a very big man" and said it "looks like he filled up almost the entire -- if he was standing up, he would fill the entire doorway." By contrast, defense counsel's questioning described Kitchens as "a small man" who was 5'6" and weighed 160 pounds. After contrasting their sizes again, defense counsel asked whether someone who is big could be intimidating and whether a large person "rais[ing] their voice" could be intimidating. Defense counsel also asked whether a large person threatening someone could cause the threatened person to be afraid. Later, while a video of the incident was playing, defense counsel

twice referred to Desoto as "filling" the "doorway." Corporal Martinez generally agreed with counsel's size assessments, though she also described Kitchens's size as "average" and Desoto as "overweight." The corporal agreed that the described size or behavior "can be" intimidating or cause someone to be afraid.

Defense counsel also asked whether the handlebars on Desoto's motorcycle were low or high, and the witness answered that they were high. Defense counsel asked whether a Harley-Davidson motorcycle would make a lot of noise, and the witness answered that she assumed so, but wouldn't have paid attention if she heard one coming down the street.

In cross-examining Deputy Christopher Cooke, defense counsel described Desoto as 5'7" and weighing 280 pounds. Counsel also described Desoto as a "big man," who was "substantially bigger" than Kitchens. The witness agreed with those assessments.

Defense counsel asked how Desoto was dressed, and the deputy responded, "Kind of like a mechanic." Defense counsel then asked, "He wasn't dressed in like he owned a Jaguar or Lamborghini or high-end Mercedes?" The witness responded that the question was not necessarily fair because he had seen "some pretty trashy people driving cars like that." Defense counsel asked, "If someone walks in dressed the way he was, would you suspect they owned a Jaguar?" The witness answered, "Probably not."

Defense counsel further questioned the deputy about Desoto being a "big man" and the potential menacing effect of that size. And counsel asked questions about whether gesturing with hands could be menacing, but Deputy Cooke responded, "Depends on what you do with them," and "Hard for me to say about that one." Defense counsel also asked if Desoto's "size fills that doorway," if "[h]is body fills the whole door," and if it was "[p]retty much the whole door."

Defense counsel also asked whether Desoto rode a "big Harley," and the deputy responded that it was a "cruiser" and not a "bagger." Defense counsel asked if the vehicle made a lot of noise, and the deputy said he did not know. Defense counsel asked if Harleys typically make a lot of noise, and the deputy responded not if it were "stock" but it would if "you change it." Defense counsel asked if the handlebars were raised, and the deputy responded affirmatively and said "they seem outside the stock."

Defense counsel asked, "Based upon your training and experience, have you seen people the size and dressed like Mr. Desoto riding Harleys like that in a menacing manner?" A relevance objection to that question was sustained.

### 5. *Testimony of Victim's Family Members*

Desoto's mother-in-law referred to Desoto as "Tommy" throughout her testimony. Desoto's uncle (by marriage) also referred to him as "Tommy."

### 6. *Defense Questioning of Defense Expert*

From Dr. Gerald Harris, defense counsel elicited testimony that a person could be perceived as strong, threatening, or intimidating based on his size and the size disparity of 280 versus 160 pounds. Defense counsel also elicited evidence that most people in our culture would be concerned when someone riding a motorcycle with high handlebars, wearing dark sunglasses and a dark shirt, "comes into a business who you've never seen before." The expert further agreed that a dangerous situation could be presented when an "intruder into the business" raises his voice, so that it gets louder and angrier, after demanding to see a "long-haired machinist" and being told that no such person is present. Dr. Harris also agreed that the words, "We're going to fuck you up," conveyed "in a loud angry voice, would . . . be the kind of words that would cause someone to be afraid."

Defense counsel also elicited testimony that fear, and the fight-or-flight instinct, could overcome the ability to control behavior. The expert testified that a fight-or-flight response could be set off by "phobias" such as the fear of a spider or a dog.

### 7. *Defense Questioning of Kitchens's Employees*

Chad Finch testified that Kitchens's shop dealt with "[h]igh-end luxury European, race car restoration, and luxury cars and maintenance." Finch did not know Desoto and had never met him before. Nevertheless, before asking Finch to describe Desoto, defense counsel asked, "[Y]ou know his name is Hipolito Desoto, correct?"

Defense counsel then asked Finch about his impression of Desoto, and Finch testified that Desoto was not the type of person that normally came to the shop and that it was "odd" to see a "big, burly guy on a Harley" because the shop did not work on motorcycles. Finch also said that customers normally came to the shop by appointment and did not just show up without advance notice. When specifically asked about Desoto's size, Finch responded that he was "a big guy." When asked if he was concerned when he saw the big guy, Finch said, "a little." When asked why, Finch responded, "Like I said before, it's just not a normal client of ours. Like it's not -- he's a big guy on a Harley, looks a little rough. He's just not our normal clientele. So it was just very odd and out place."

After the shooting, Finch described Kitchens as "very distraught, very upset, just frantic, scared." He further stated that Kitchens was "very frantic, very scared, and running around on the phone," and that he asked Finch to call 911.

Jonathan Bell testified that Desoto was an "unexpected visitor" with a "frightening appearance." When asked what he meant by "frightening appearance," Bell responded, "Just looked

scary and angry and didn't look like the typical person we deal with. Bell later described Desoto as "[t]aller than me, very broad-shouldered, stocky, muscular build." At one point, Bell heard part of the conversation between Desoto and Kitchens. After hearing Kitchens say, "I can't help you," Bell heard Desoto respond with something along the lines of, "Talk like that is going to get your ass beat." Bell heard Kitchens ask, "What are you going to do?" He heard Desoto reply, "Fuck you up." Bell said he saw Desoto during the altercation but "was trying not to stare at him because I didn't want to draw attention to me." When asked why, Bell responded, "I didn't think that I could defend myself against him." When asked if Desoto scared him, Bell responded, "Yes."

### 8. *Kitchens's Testimony*

Kitchens said that he started racing motorcycles in 2008, when he was 22. He was injured racing motorcycles and decided to switch to racing cars, in 2014.

Kitchens described first seeing Desoto riding his motorcycle outside his business. Kitchens described himself as nervous and uneasy because there had recently been a violent incident in Waco between motorcycle gangs. Nevertheless, he testified to also being curious. These thoughts and feelings were described as follows:

> Q. Now we see -- oh, yeah -- do you remember the first time you heard -- or something brought -- caused your attention to a motorcycle?
>
> A. Yes.
>
> Q. Did you see it go by your office from your desk?
>
> A. Yes.
>
> Q. Did anyone call your attention to the motorcycle?
>
> A. Yes.

Q. Who called your attention to the motorcycle?

A. One of the employees. I don't remember specifically which one.

Q. Do you remember why -- what drew your attention to the motorcycle?

A. It was very loud, and it was going very slowly. It went by the side of the building, and it came back around the front very slowly.

Q. And had you ever seen the man that you saw on the motorcycle before?

A. I had not.

Q: What was your impression as you saw the motorcycle go slowly in front of your windows?

A: Well, this was right after the shootout with the police and bikers in Waco, so I was a little --

MR. GILLIAM: Objection, Your Honor. Narrative and non-responsive.

THE COURT: Overruled.

A: So that was still fresh in the news. So my first thought seeing a big, burly biker without a helmet that I didn't recognize, I was a little uneasy. But I was curious. I thought maybe he's got a Porshe, or maybe buying a car, or restoring a car. But it was out of character for how that typically is.

* * *

Q. When did you first become concerned about Desoto?

A. Well, after the second time I saw him go by, he was going really slow and looking in the bays. Like I said, this police and biker shootout was right after Waco. I didn't know why he was going by and going so slow and multiple times and looking in the bays, and it was of a concern.

Q. You saw him go by on the east side of the building?

A. Well, I heard him, and I saw the motorcycle go by on the monitor when he went by on the side, and I heard and saw him go by again when he went across the shop.

Kitchens testified to Desoto being much bigger than he was:

Q. Now, the video, what do you think when you first -- when you're sitting in your chair, and you see Mr. Desoto at your door like it is right now on that screen?

A. I think that's a big fellow, and I wonder what he's doing.

* * *

Q. How much bigger was he than you?

A. From where I was sitting down, it looked like he was at least two to three times bigger than me.

Kitchens described the encounter and his thoughts and feelings, from Desoto getting angry

to Desoto using threatening language and walking back to the door, only to close it and turn around:

Q. As you're sitting in your chair behind your desk, how are you feeling?

A. At that point, I was becoming scared.

Q. How were you becoming scared?

A. There was a big, angry guy. He was looking for somebody. I didn't know who he was talking about. And his immediate reaction was to tell me that I didn't fucking get it.

* * *

Q. When he starts talking with his hands -- we see him here rolling his right hand. What did you think was happening as he was talking right then?

A. He was getting more angry and more animated.

Q. What was the tone of his voice? Was it the same as when he first came in, or did it get louder?

A. He got louder and angrier progressively.

Q. And then what did he say?

A. After I told him over and over that I didn't know who he was talking about, and I asked him to leave. He said that, Shit like this is why they were going to come back, and they were going to beat my ass.

Q. "Shit like this was why they were going to beat your ass?"

A. Yes, sir.

Q. How did you feel when you heard that somebody was going to come back and beat your ass?

A. I was terrified. I had visions in my head of 20 bikers rolling up with shotguns and clubs. And I didn't understand what was happening.

* * *

A. I don't -- I don't know. I don't remember. I was just -- I just remember thinking that I needed this guy to leave and to get out. And he started leaving. So I was, like, okay. Great. Now he's -- now he's on the way out at least.

Q. And so every step he took toward the door, you had a sense of relief you said?

A. I mean, I was uncomfortable, and I was scared because he said they were going to come back for me. But if he at least looked like he was going to leave and then I could call the police and then make a report and let them know that this guy had come and threatened to come back and to make sure -- but I thought -- I thought he opened the door. I thought he was leaving.

Q. So he's -- he pushes the door open and stops.

[sustained objection to leading]

Q. What do you see him doing on the video?

A. He pushes the door open and then he stops.

Q. And then what happens?

A. He tells me, "Actually, I'm going to fuck you up right now." And he pulled the door closed and started to turn back into the shop.

Q. So as we see him -- starting to put -- starting to put the earbuds into his pocket, what is he saying when he's doing that?

A. That he's about to fuck me up right now.

Q. How -- what was the tone of his voice?

A. He yelled it. It sounded like he meant it.

Q. From your perception, what did you think he was about to do?

A. I thought he was about to beat me to death. I don't know why. I didn't know who the guy was. I don't understand.

Q. What did you do?

A. I thought he was going to beat me to death, so pulled out my pistol, and I shot him.

Q. And why did you shoot him again after he going down?

A. I thought he was getting back up off the ground. I thought he was going to get up off the ground and beat me. I didn't understand how I had shot somebody. I thought he was still coming after me. And I thought, how can you shoot somebody and they fall down -- after I shot him, and he -- he didn't stop.

Defense counsel asked Kitchens to describe his thoughts and feelings as the encounter escalated:

Q. This man was in your shop for two-and-a-half minutes approximately. Can you describe the level -- the emotions you felt from the first time you saw Mr. Desoto until the time just before you shot?

A. It went from being curious to uneasy, to scared, to terrified, to thinking I was about to die. I wouldn't have shot him, otherwise. I thought he was going to kill me. I didn't understand.

* * *

Q. Did the tone of his voice escalate?

A. Yes, sir.

Q. And did your fear escalate along with it?

A. Yes, sir.

Q. The entire incident was 2-and-a-half minutes, correct?

A. Yes, sir.

Q. Just before he turned around, you -- as you look at the video, and he -- he's standing in front of you, his voice is raised. You -- can you remember what you were feeling?

A. Terror.

The prosecutor also explored Kitchens's feelings during the encounter:

Q. At this point, Mr. Kitchens, you said you were in fear for your life, right?

A. Yes, sir.

Q. You thought he was going to beat you up?

A. I thought he was going beat me to death.

Q. You thought he was going to beat you to death?

A. Yes, sir.

Q. You agree with me where we see you standing right now in this video, you're on the other side of your desk -- right here in front of your desk?

A. From what it looks like on the video, yes, sir.

Q. You thought he was going to beat you to death. Wouldn't it be smart to have your desk in between you and him?

A. I was thinking more of how to get out the door and away from him then staying trapped behind the desk, and he could come over the desk.

Q. So you thought he was going to leap over the desk and do that?

A. I didn't know what he was going to do. But when he pulled the door closed and told me he was going to fuck me up right then, I didn't have time to think about how many possibilities there were. I was in fear for my life, and I wanted him to stop, and I wanted to get away from him as fast as I could.

Q. So you're going to shoot him and walk over his body to the front door; is that your plan?

A. Well, there's also a door to the left of the desk that goes into the bay area.

Kitchens also described his emotional reaction to first arriving in prison:

> Q. What was it like when you first arrived at TDC?
>
> A. It's the second scariest thing that I have experienced in my life.
>
> Q. Why?
>
> A. They put you, basically, in a big, open tank with hundred people. And they are there with face tattoos, and gang signs, and just -- the most violent, scary people that you can imagine.

### 9. Defense Closing Argument

Two defense attorneys delivered closing arguments. In addressing whether Kitchens had

"adequate cause" to be suffering from sudden passion, the first defense attorney focused on Desoto's

size and the threatening statements he allegedly made:

> And do you not think that it's provocation for somebody to walk in that's 280 pounds -- looks like a biker because he is a biker. He's 280 pounds, walks in and starts talking: Well, I'm going to fuck you up. Imagine if somebody did that walking in your front door. Let's say you're having an open house -- trying to sell your house, and some 280-pound hulk walks in.
>
> * * *
>
> But he started with, "We're going to fuck you up." You expect -- we're going to get to this in a minute -- the investigation to determine: Why was he using the word plural? Was he poor in grammar? There's no evidence to that. Talking about him and a bunch of other bikers, "We're going to come and fuck you up."
>
> * * *
>
> Now, A 280-pound man who has just come in and disrupted your business, screaming at you, telling you he's going to fuck you up. He starts to head out the door, and he turns around. And another way to interpret that is he's preparing for battle. He is taking his earplugs out -- or his earphones, whatever they are. He's stashing them. And he's about to head that way. In fact, if you look, his feet are already pointed. He's pivoting. And he says -- we heard this from Jonathan Bell: "I am going to fuck you up." They heard that. Will testified to it.

Responding to the State's contention in opening argument that Kitchens must have provoked Desoto,

defense counsel argued:

> [N]obody could figure out why this angry man came into this business.

* * *

> It's just one of those enigmas that you're going to have to figure out on your own. And that's what he wants. He wants to leave this to Will, who never had a violent act in his life from the testimony that anybody we ever heard. Somehow he decided on this day to somehow provoke -- I mean, a 280-pound man to the point to where he says, "I'm going to fuck you up" -- "We're going to fuck you up." But wait, all of that provocation would have had to come after he entered the building and was going to leave. So that's eight seconds. In eight seconds, somehow Will Kitchens had to have provoked this man to turn around and say, "I'm going fuck you up."

The second defense attorney focused on Kitchens's stated mental state, the size of Desoto, Desoto's alleged threats, and the actions seen on the video:

> "I thought I was going to die[.]" [T]hose are the words that Detective Cooke deleted from his report that [he] would not allow anyone to read and to consider. "I thought I was going to die. Call 911. I shot him. I thought I was going to die." And why did Will think he was going to die? He thought he was going to die because a man -- a man went to the door starting to leave, and things were calming down, calming down. A 280-pound, menacing biker standing in a doorway, turns into Will, who is sitting behind his desk -- sitting and working like he's supposed to, like he's done every day in that business for four years. And he yells, "I'm going to fuck you up."

* * *

> You see him nodding his head. When he's nodding his head, what is he saying? From the time he gets to the door and until the time the shots were fired, we're dealing with under eight seconds.

* * *

> Sudden terror. What does it take to terrorize a human being to cause the fight-or-flight phenomenon to take over your body, take over your ability to reason? Cooke told you it exists. It happens to police officers; it happens to all of us, fight or flight. How does that control who you are? A man is sitting in his home -- sitting in his office at his desk. And he sees -- minding his own business, working, cutting up with his friends, enjoying life. And a big man stands over him -- stands 3-feet away, 2-feet away. And Will's in this chair, and the man is raising his voice and not making sense for just over two minutes. We're not talking about an hour conversation; we're talking about instantaneous words.

\* \* \*

How many words does it take to terrorize somebody? How many words does it take for a big man, who weighs over 100 pounds more than Will Kitchens did, to place him in absolute terror that he was going to die? Can that happen to us in a minute, a second? How many seconds? Three seconds, four, five? Could those words, "I'm going to fuck you up," would this get your attention? If somebody said to you, "I'm going to fuck you up," and they're looking at you, and you're sitting behind your desk, would that scare you to death? Would that make you pause and think, I'm in deep trouble? The answer is, yes. That is sudden -- this is sudden terror because of what Hipolito said and his appearance can terrorize an ordinary person.

\* \* \*

The evidence is clear that but for Tommy Desoto stopping at that door, closing that door and turning toward Will, nothing would have happened. If he kept on going out that door, he would have gotten on that bike and rode away; but he didn't. He stopped. He stopped. And he turned toward Will and said, "I'm going to fuck you up now." That immediate threat provoked Will to grab his gun and start shooting. That immediate terror provoked Will to start shooting. This is Will's home. This is his castle. This is what he's most proud of that he has accomplished in building a business. The charge tells you that you must act -- Will had to act under the immediate influence of sudden passion, which means immediate influence of sudden terror that was caused by Hipolito Desoto.

Referring to Desoto's prior assault conviction, and again to his size, defense counsel called him a violent man:

> And how do we know he's a violent man? What kind of man hits their wife? Not once, but in three separate counts. Just a little domestic violence. No big deal. That's what the State wants you to hear -- to think. But who -- what man -- what 280-pound man hits his wife? A bully. An angry man hits a small woman. We know what type of man hits his wife, and that's Hipolito Desoto. If he's capable of hitting his wife, he's capable of fucking somebody up in their office because he wants to.

We observe that the second defense attorney referred to Desoto's first name of "Hipolito" six times in closing argument. Once, the first name was used alone, and the other five times it was paired with Desoto's last name. The first defense attorney referred to the first name once, in conjunction with Desoto's full name—first, middle, and last. The prosecutor's initial closing

argument referred to Desoto solely by the name "Tommy." The only reference to "Hipolito" in the prosecutor's final closing argument came during the portion of the argument at issue in this case.

### C. The State's Final Closing Argument – At Issue in this Case

In final closing argument, the prosecutor accused the defense team (and possibly Kitchens) of using code words to suggest that people of Hispanic origin were scary:

> I do want to talk to you about something that, for whatever reason, we haven't talked about. And in the five-and-a-half years since this happened, we've used code words to signify it. But no one has actually explicitly said it. Let's talk about the code words they used: "He's overweight." He's 280 pounds. He was a ["]biker." And he suddenly turned into an "outlaw biker," during closing arguments. That he rode a "Harley Davidson motorcycle with his handle bars that were up here." That he had "facial hair." That he was "scary." *They're all just saying he was scary because of what? He was scary because he was a Hispanic guy. That's what they're not saying.*[3]

Defense counsel objected and a bench conference ensued. Defense counsel argued that the State had injected race into the trial in violation of the Fifth and Eighth Amendments. The State responded that "it's deliberately overwhelming that the complainant was, in fact, Hispanic." The prosecutor also said, "I'm not commenting on the defendant's race; I'm commenting on the race of the complainant." The following then occurred:

> [DEFENSE COUNSEL]: The suggestion is being made that he was shot because he was a large Hispanic man; that's why this argument was starting. And that's not permissible -- because this isn't a racial shooting, and that's not permissible. And there's no evidence at all."

> THE COURT: I mean, there has been a lot of evidence that the Court has heard regarding the defendant's appears -- excuse me -- the complainant's appearance throughout this entire trial. I -- State, are you commenting on the defendant's -- excuse me -- complainant's appearance?

> [PROSECUTOR]: Yes. He was Hispanic, Judge.

---

[3] Emphasis added.

THE COURT: Defense, your objection is overruled.

Then the bench conference ended, and the prosecutor continued arguing to the jury as follows:

> The complainant was Hispanic. It's not a shock to anyone, right? You can see it in his picture. Why do you think they keep calling him "Hipolito Desoto?" It's "Tommy Desoto." *The defendant's own prejudices* --[4]

Defense counsel interrupted, objecting: "Your Honor, I object. There's been no evidence of any prejudice by Mr. Kitchens." The trial court overruled the objection, and the prosecutor continued, saying, "Don't let the defendant's own prejudices become your own."

### D. Appeal

On appeal, Kitchens complained in two points of error that "the trial court erred in failing to sustain Kitchens's several objections to the injection of race into the trial" and that "by injecting race into the trial final argument, the State's trial counsel engaged in prosecutorial misconduct and violated Appellant's Due Process rights."[5] In the body of his argument on these points, Kitchens claimed that the State's comment that Kitchens was "prejudiced" was outside the record:

> Appellant would point out that, while the evidence did indicate that the deceased was Hispanic, as counsel for the State argued, nothing in the record suggests nor supports the assertion by State's counsel that Appellant harbored any racial prejudice towards the deceased or acted because the deceased was an Hispanic man.
>
> * * *
>
> Counsel for the State intentionally accused Appellant of being a racist without any foundation.

Kitchens also pointed out that he himself never personally referred to Desoto by name and that only his attorneys referred to Desoto as "Hipolito Desoto." He suggested that the State's references to

---

[4] Emphasis added.

[5] Some capitalization from Kitchens's brief converted to lowercase for ease of reading.

the attorneys doing so constituted "striking at the defendant over the shoulders of counsel," though he acknowledged that he did not object at trial on that basis.

Describing Kitchens as essentially arguing that the State left the jury with the impression that the shooting was racially motivated, the court of appeals concluded that this argument "mischaracterizes both the evidence and the State's closing arguments."[6] The court said that the evidence showed that Kitchens had never met or seen Desoto prior to the shooting and that his "impressions about the level of danger Desoto posed were based on his observations of Desoto's appearance and actions during the approximately two-and-a-half minutes between when Desoto entered Kitchens's shop and when Kitchens shot him."[7] The court remarked that Desoto was unarmed and entered during business hours.[8] The court also remarked that Kitchens himself rode motorcycles and that Kitchens and Desoto were dressed similarly.[9]

The court of appeals also said that Kitchens and his employees described Desoto as being dressed like a "mechanic" rather than someone who owned a Jaguar, Lamborghini, or high-end Mercedes.[10] The court also described them as saying it was "very odd" to see "a big, burly guy on a Harley," which was "not a thing you normally see pulling up" to the shop.[11] The court also pointed

---

[6] *Kitchens v. State*, No. 01-22-00195-CR, 2024 WL 1313709, *6 (Tex. App.—Houston [1st Dist.] Mar. 28, 2024) (not designated for publication).

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.* at *7.

[11] *Id.*

to the employees describing Desoto as "a little rough," not being the business's normal clientele, "an unexpected visitor with a frightening appearance," and someone who "just looked scary and angry and didn't look like the typical person we deal with."[12]

The court of appeals pointed to Kitchens's own testimony that Desoto's appearance made him "a little uneasy."[13] The court pointed to Kitchens describing Desoto as "angry" and "animated."[14] The court said that defense counsel emphasized Desoto's appearance, pointing to him being a "biker," weighing 280 pounds, and disrupting Kitchens's business. The court further pointed to defense counsel's characterization of Desoto as "menacing," an "outlaw biker," someone who "wasn't where he was supposed to be," and someone whose appearance and words were enough to "terrorize an ordinary person."

The court of appeals said that Kitchens's "own evidence and defensive theory put his impressions of Desoto at the center of the punishment hearing.[15] The court pointed to Desoto's race being apparent from the surveillance video and the autopsy report.[16] The court described the defensive theory as Kitchens judging "the degree of danger that Desoto posed based on Desoto's appearance as a large biker who rode up to the business on a Harley and based on Desoto's angry

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* We note that "race" was the court of appeals's term for Desoto's status as Hispanic. *See id.*

and threatening manner when Kitchens could not help him find the machinist."[17] The court further described Kitchens's argument as him being "so terrified by Desoto's appearance and threats to beat him that he acted under sudden passion when he fired his weapon."[18] The court of appeals said that "Desoto's race was an obvious part of his appearance, as was the fact that Desoto rode a motorcycle and was more than 100 pounds heavier than Kitchens."

The court further said that the prosecutor "did not belabor the references to Desoto's race, mentioning it just twice in its closing argument, in addition to repeating multiple aspects of Kitchens's evidence regarding Desoto's appearance."[19] Later, responding to Kitchens's reliance on cases holding that the injection of race is improper, the court of appeals said those cases were "materially distinguishable, primarily because none of the cases cited by Kitchens involved a situation, as here, where the issue of race arose in response to the defendant's own testimony and defensive theory."[20] The court said that the complained-of comments were made during closing argument, not during testimony, and that there was a non-gratuitous, "nonprejudicial explanation" for the comments—Kitchens's own defensive strategy.[21] The court found that this strategy began with defense counsel's "bandito" reference during voir dire and continued with Appellant placing his personal feelings and reactions to Desoto's appearance and mannerisms before the jury.[22]

---

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

As for whether the prosecutor's argument was supported by the record, the court of appeals held, "The State's argument that Kitchens acted based on a bias or prejudice formed during his limited interaction with Desoto is a reasonable inference from that evidence."[23]  The court suggested that it was reasonable to infer that Desoto's appearance as a Hispanic man played a role in Kitchen's judgment that Desoto was "a 'menacing, 'outlaw biker' who 'disrupted' business by not being 'where he was supposed to be.'"[24]  Later, in concluding that the prosecutor's comment on "the race of the complainant" was "materially different" from cases that involved an improper reference to race, the court of appeals found that the prosecutor "looked to what Kitchens himself actually said and did in making its inference that Kitchens's perception of the threat Desoto posed was informed, at least in part, by the fact that Desoto was a large Hispanic male."[25]  And the court further contended that Kitchens's "own emphasis on Desoto's appearance and mannerisms" permitted the trial court to conclude that "the evidence supported the State's inference that Desoto's race was a factor in the effect his appearance had on Kitchens."[26]  The court concluded that "the State's argument here falls within the wide latitude afforded a prosecuting attorney to draw all inferences from the facts that Kitchens himself put into evidence and made relevant to his sudden-passion issue."[27]

In the middle of one of its discussions about drawing reasonable inferences, the court of appeals also suggested that the prosecutor "was responding to Kitchens's own defensive argument

---

[23]  *Id.* at *7.

[24]  *Id.*

[25]  *Id.* at *9.

[26]  *Id.*

[27]  *Id.*

when the prosecutor suggested that Kitchens's bias or prejudice—whether based on Desoto's identity as a Hispanic man, a biker, an overweight man, or some other obvious characteristic identified in the evidence—influenced his state of mind and his perception that he was in serious danger from Desoto."[28] The court then said, "Thus, the State's argument drew a reasonable inference from Kitchens's own testimony about Desoto's appearance, and the argument was also a reasonable response to Kitchens's defensive issue that he acted under the influence of sudden passion."[29] In support of this contention, the court cited cases holding that proper argument includes "answer to argument of opposing counsel" and to counsel's "theories in the case."[30]

### E. Discretionary Review

In his ground for review in his petition for discretionary review, Kitchens complained:

The Court of Appeals erred in determining that the State's final argument that Appellant shot the Complainant because he was afraid of the Complainant because he was Hispanic was a legitimate response to Appellant's argument that Appellant's was afraid of the Complainant because he was a large, apparently, angry man, who was riding a large loud motorcycle, who threatened Appellant stating, "I am going to fuck you up right now" when there is no evidence in the record that Appellant or any witness other than the medical examiner identified the Complainant as Hispanic.

The petition's summary of argument, in its entirety, articulated his claim more succinctly:

The record is devoid of any indication that Appellant had any prejudicial intent or that his actions were taken because the deceased was an Hispanic man[,] and the trial court erred in repeatedly overruling Appellant's objections.

Amplifying the issue in his brief, Kitchens said that the prosecutor "accused Appellant, without any

---

[28] *Id.*

[29] *Id.*

[30] *Id.* (citing *Milton v. State*, 572 S.W.3d 234 (Tex. Crim. App. 2019), and *Garcia v. State*, 126 S.W.3d 921 (Tex. Crim. App. 2004)).

evidence to support the accusation, of shooting the deceased because Appellant was afraid of Hispanics." Kitchens contended that the State "is not allowed to draw an inference from Appellant's description of the complainant being big and burly to that he was afraid of the complainant because he was Hispanic." Kitchens also argued, in his petition and brief, that the State improperly injected the subject of race in its closing argument.

In its brief, the State responded that the prosecutor's argument was proper "as a reasonable inference from the record and as a response to counsel's argument." The State said that Kitchens and several of his witnesses emphasized Desoto's appearance in saying that he looked frightening and that counsel built upon this testimony to argue that Desoto's appearance and words were enough to terrorize an ordinary person. The State contended that Desoto's appearance necessarily included his Hispanic features. The State also pointed to the court of appeals's opinion as considering evidence that Kitchens checked to make sure his gun was loaded before he interacted with Desoto, that an employee said Desoto had a frightening appearance and did not look like "the typical person we deal with," and that Kitchens's expert testified that a "phobia" can cause someone to perceive a threat where none exists. And the State pointed to the court of appeals reciting that Desoto had no prior history with Kitchens, was unarmed, arrived during business hours, was dressed as a mechanic, entered the shop looking for a mechanic, and was about the same height as Kitchens. The State also contended that Kitchens implicitly admitted that bias and stereotypes played a role in his fear of Desoto when he testified that he thought about the bikers in Waco and had visions of 20 bikers rolling up with shotguns and clubs. Although the State conceded that there was no direct evidence in the record showing that Desoto's race played a role in Kitchen's perceived terror, the State contended that there was a "large amount of circumstantial evidence supporting this inference."

At oral argument, the State argued that the reasons Kitchens gave for being afraid of the victim applied equally to Kitchens or others he found nonthreatening, leaving the victim's Hispanic race as the only remaining basis for that alleged fear. The State argued that Kitchens rode motorcycles, had a friend who worked on motorcycles, and knew of someone in the area who rode a Harley to work. The State also contended that Kitchens and Desoto were dressed almost exactly the same, that Desoto was only an inch taller than Kitchens, and that Desoto was not armed or on drugs. The State conceded that Desoto was 100 pounds heavier than Kitchens but argued that that difference was offset by Kitchens having a loaded firearm, a desk between them, and two able-bodied friends on hand. The State also pointed to the time of day not being a factor, since Desoto entered during business hours. According to the State that left only the "elephant in the room"—Desoto's Hispanic race. The State also mentioned comments about Desoto being out of place as "otherizing."

The State also claimed in its brief that neither the prosecutor nor the jury had to credit the testimony of Kitchens or his witnesses that Desoto's size and conduct were the only factors motivating Kitchens's decision to shoot him. And the State said that the jury did not have to believe Appellant's "unverified claim that the complainant threatened him in the moments before his murder."

The State also contended in its brief and in oral argument that the prosecutor's comment was permissible as a response to opposing counsel because the defense had asked the jury about "banditos and motorcycles" in voir dire and had referred to Desoto as an "outlaw biker" in closing argument. The State contended that the "outlaw biker" comment itself went outside the record. In its brief, the State also contended that, even if the prosecutor's comment were erroneous, defense

counsel "invited" it by making Desoto's appearance the central focus of his sudden-passion claim.

## II. ANALYSIS

Generally, proper jury argument falls within one of four areas: (1) a summation of the evidence, (2) a reasonable deduction from the evidence, (3) an answer to an argument of opposing counsel, and (4) a plea for law enforcement.[31] We review a trial court's ruling on the propriety of a prosecutor's jury argument for abuse of discretion.[32] A trial court abuses its discretion if its decision "lies outside of the zone of reasonable disagreement."[33] For various reasons, the State and the court of appeals have claimed that the prosecutor's comments fell within areas (2) and (3)— as a reasonable deduction from the evidence and as a response to defense counsel. We disagree.

### A. The prosecutor's commentary was not a reasonable deduction from the evidence.

### 1. *No testimony suggested that Kitchens harbored any racial motivations.*

"[E]rror exists when facts not supported by the record are interjected in the argument."[34] The State concedes that there was no direct evidence that Kitchens harbored any racial motivation, and we agree. We have seen cases in which the evidence showed that the defendant held racist beliefs about the victim's race.[35] Kitchens's case is not one of them. No evidence at trial suggested that Kitchens held any biases or prejudices about Hispanics. The State did not introduce any evidence

---

[31] *Milton*, 572 S.W.3d at 239.

[32] *Id.* at 241.

[33] *State v. Heath*, 696 S.W.3d 677, 688-89 (Tex. Crim. App. 2024).

[34] *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008).

[35] *See*, *e.g.*, *King v. State*, 29 S.W.3d 556, 559 (Tex. Crim. App. 2000) ("The State presented evidence of appellant's racial animosity, particularly towards African-Americans.").

of past statements by Kitchens that might show a bias or prejudice against Hispanics or any other minority group. Nor did any witnesses suggest any such bias or prejudice by Kitchens.

Nor did Kitchens provide any such evidence in his own testimony. If one were to review Kitchens's testimony by itself, without considering anything else in the record, one would have no idea that Desoto was Hispanic. Not once in his testimony did Kitchens mention Desoto's Hispanic status, nor did he even mention Desoto by name. Kitchens did point to Desoto's size, to several facts associated with being a motorcyclist, and eventually, to threats. None of these facts are about Desoto being Hispanic. Kitchens initially suspected and later feared that Desoto was part of a motorcycle gang. But being part of a motorcycle gang is not a description of someone's race or minority status.

### 2. *Trial counsel's statements are not a basis for drawing reasonable deductions from the evidence*.

Before we address whether racial motivation can be *inferred* as a reasonable deduction from the evidence, we first clear the air regarding statements made by Kitchens's trial attorneys. In parts of its opinion, the court of appeals seems to mix into its "reasonable deductions from the evidence" discussion what counsel said during various parts of the trial. Generally, unsworn statements of an attorney are not evidence.[36] That includes statements made during voir dire[37] and closing argument.[38]

---

[36] *Tanner v. State,* 707 S.W.3d 371, 381 (Tex. Crim. App. 2024); *State v. Lopez*, 631 S.W.3d 107, 115 (Tex. Crim. App. 2021).

[37] *Hyundai Motor Co. v. Vasquez*, 189 S.W.3d 743, 753 (Tex. 2006).

[38] *Ukwuachu v. State*, 613 S.W.3d 149, 157-58 (Tex. Crim. App. 2020).

Also, an attorney's questions of witnesses are not evidence.[39]  To be a "reasonable deduction from the evidence" the deduction at issue must be from *evidence.*  So, for example, the "banditos" question asked by defense counsel in voir dire is not evidence from which a reasonable deduction can be made.  Nor is defense counsel's "outlaw biker" comment during closing argument.  Nor are any of the references defense counsel made to Desoto's Hispanic first name.  We address later whether various statements made by defense counsel caused the prosecutor's argument about prejudice to qualify as an "answer to an argument of opposing counsel."  Here, it is enough to say that counsel's statements are not a basis for drawing reasonable deductions from the evidence.

### 3. *A reasonable deduction from the evidence must be more than mere speculation.*

We now turn to whether racial-motivation can be inferred as a reasonable deduction from the evidence in this case.  Our improper-argument cases have indicated that mere speculation is not a reasonable deduction from the evidence.[40]  Similarly, our sufficiency-of-the-evidence cases have

---

[39] *Irsan v. State*, 708 S.W.3d 584, 615 (Tex. Crim. App. 2025); *Madden v. State*, 242 S.W.3d 504, 515 n.30 (Tex. Crim. App. 2007).

[40] *Cooks v. State*, 844 S.W.2d 697, 728 (Tex. Crim. App. 1992) ("Arguments made during the guilt portion of the trial must be based upon facts in evidence.  Clearly, it is improper to invite the jury to speculate on the existence of evidence not presented."); *see also Ex parte Scott*, 541 S.W.3d 104, 123 (Tex. Crim. App. 2017) ("The evidence shows that Scott was a teacher who had lived in various places.  It also showed that he had photographs in a shoe box of young children and that he lured in the young victims in this case by grooming them. From the context of the State's argument, it appears that it was asking the jury to infer that Scott may have tried to groom other children.  Even if it did, *that argument was not a reasonable deduction from the evidence, and it went outside of the record because there is no evidence to support that proposition*.") (emphasis added); *Coble v. State*, 871 S.W.2d 192, 205 (Tex. Crim. App. 1993) ("The portion of the prosecutor's remarks asking whether Bobby and his father were thinking of having a fair trial certainly was not a summation of the evidence adduced at guilt/innocence; nor was it a reasonable deduction from that evidence or a plea for law enforcement.  And, because the only time defense counsel made any reference to appellant having or not having a fair trial was in his objection immediately preceding this portion of the prosecutor's argument, the prosecutors remarks were not in response to appellant's closing argument.  Because the portion of the prosecutor's closing

said that juries may not come to conclusions based on mere speculation.[41] These two types of cases involve the same considerations—a prosecutor cannot argue as a reasonable deduction from the evidence what a jury itself is not allowed to deduce. In the sufficiency context, we have said that "speculation" is "mere theorizing or guessing about the possible meaning of facts and evidence presented."[42] That definition of "speculation" applies equally to the improper-argument context.

### 4. *The victim's Hispanic status does not automatically justify a comment claiming that the defendant's conduct was racially motivated. Nor do race-neutral comments by the defendant about the victim's appearance.*

The trial court's articulated reason for permitting the prosecutor's argument was that the prosecutor was commenting on Desoto's appearance. That amounts to saying, "The victim was Hispanic. Therefore, the prosecutor can accuse the defendant of being racially motivated in shooting him." If a claim that the defendant's conduct is racially motivated can be justified merely as a comment on the victim's race, then such comments can be made in any cross-racial prosecution—i.e., any prosecution in which the defendant's race differs from that of the alleged victim.

The court of appeals concluded that the prosecutor's comment was permissible because Kitchens made Desoto's appearance an issue in the case. That reasoning is a little bit better than the

---

argument asking the jury to speculate on whether Bobby or his father wanted a 'fair trial' before they were murdered did not fall within the four permissible areas of jury argument, that portion of the State's argument was in error.").

[41] *Baltimore v. State*, 689 S.W.3d 331, 342 (Tex. Crim. App. 2024) ("Juries are not, however, permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions."); *Hooper v. State*, 214 S.W.3d 9, 15-16 (Tex. Crim. App. 2007) (same, except for placement of "however").

[42] *Hooper*, *supra* at 16.

trial court's but not by much. It amounts to saying, "Once the victim's appearance has been placed in issue, any other comment relating to appearance, *no matter how irrelevant*, is fair game. That includes racism because racism is about appearance." Such reasoning would open the floodgates to unjustified allegations of racial animus or motivation in cases where the race of the defendant and the alleged victim differ.[43]

The absurdity of the lower courts' reasoning can be illustrated by a hypothetical that changes the victim's appearance. Suppose that, instead of being Hispanic, Desoto was a white male with *red hair*. There is folklore that red-haired individuals have short tempers. Taking into account this assumed change in the facts, the prosecutor's argument would be as follows:

> I do want to talk to you about something that, for whatever reason, we haven't talked about. And in the five-and-a-half years since this happened, we've used code words to signify it. But no one has actually explicitly said it. Let's talk about the code words they used: "He's overweight." He's 280 pounds. He was a "biker." And he suddenly turned into an "outlaw biker," during closing arguments. That he rode a "Harley Davidson motorcycle with his handle bars that were up here." That he had "facial hair." That he was "scary." They're all just saying he was scary because of what? He was scary because he *has red hair*. That's what they're not saying.
>
> The complainant *has red hair*. It's not a shock to anyone, right? You can see it in his picture. Don't let the defendant's prejudices become your own.[44]

Would it be enough to say that the defendant had a prejudice against red-haired individuals simply because the victim had red hair? Of course not. Would it be enough to say that the defendant was

---

[43] And there is no reason to think that such reasoning would be limited to white defendants who commit crimes against minority victims. *See Wisconsin v. Mitchell*, 508 U.S. 476 (1993) (hate crime enhancement used against African-American defendant where the victim was white).

[44] We have omitted the part of the prosecutor's argument that chastises the defense for repeatedly referring to the victim by his Hispanic first name because only defense counsel did that, and, as we have already explained, defense counsel's statements were not *evidence*, and so not a basis for drawing a "reasonable deduction."

prejudiced against red-haired individuals to merely point to the defendant testifying that the victim was a large man who rides a motorcycle? Again, the obvious answer is no.

The problem with the lower courts' "appearance" rationales is that they do not involve *deductions* at all, much less *reasonable* deductions. Instead, these rationales involve mere category matching—the court sees a category of evidence in the case and concludes that any argument that relates to the category is fair game. The trial court set out the category of "Hispanic" and concluded that the State's argument that Kitchens was prejudiced related to that category. The court of appeals set out the more general category of "appearance" and came to the same conclusion. Neither rationale seeks to determine whether there is an actual *link* between the evidence and the conclusion the prosecutor asked the jury to draw. But there must be a link—that is the whole point of requiring a reasonable *deduction* from the evidence.

And if we look for a link, one is obviously lacking. One cannot reasonably infer solely from Desoto being Hispanic that Kitchens shot him because he was Hispanic. Such an inference would be mere speculation. Likewise, one cannot reasonably infer solely from Kitchens describing Desoto as a "big man" and a "biker" that Kitchens shot Desoto for the completely unrelated appearance quality of being Hispanic. That inference, too, would be mere speculation, because it would be "mere theorizing or guessing" about a hidden meaning behind Kitchens's statements. The court of appeals was wrong to suggest that comments on appearance alone, no matter how irrelevant to race or ethnicity, somehow necessarily implicate racial or ethnic prejudice.

To be fair, the court of appeals has also pointed to evidence that it thinks gives rise to an inference of racial discrimination. We address that evidence, along with some of the State's arguments, in later subsections of this opinion.

***5. Kitchens's statement that Desoto did not have the appearance of a "typical" customer was based on race-neutral facts, and any inference that it was a racial reference is at best speculation. Also, the court of appeals was mistaken in saying that Kitchens made certain statements about how Desoto was dressed.***

The court of appeals and the State have suggested that Kitchens raised the issue of racial motivation by testifying that Desoto was not the kind of person that typically came to the auto shop. Although his employees also testified to that effect, the only testimony to that effect from Kitchens occurred in the following portion of his testimony:

> So that [Waco incident] was still fresh in the news. So my first thought seeing a big, burly biker without a helmet that I didn't recognize, I was a little uneasy. But I was curious. I thought maybe he's got a Porshe, or maybe buying a car, or restoring a car. But it was out of character for how that typically is.

Combined with other testimony about the nature of Kitchens's business, this testimony gave an obvious non-racial explanation for why Desoto did not fit the profile of a typical customer: the shop worked only on cars, and Desoto was *on a motorcycle.* Although Kitchens also described Desoto as "big" and "burly," not wearing a helmet, and being someone Kitchens didn't recognize, even these latter descriptions were race-neutral. Notably, there was no evidence of the racial backgrounds of Kitchens's clientele, nor did the prosecutor attempt to explore in greater detail what Kitchens meant by Desoto not being a typical customer. It would be mere theorizing or guessing to say that an unarticulated racial reason underlay the "not typical" observation.

Perhaps trying to amplify its argument regarding Desoto not being a typical customer, the court of appeals said that Kitchens and his employees testified to Desoto being dressed like a mechanic rather than someone who owned a high-end vehicle.[45] But the court of appeals has misread

---

[45] *See Kitchens*, 2024 WL 1313709, at *7 ("In addition to describing these facts about Desoto, Kitchens and his employees testified that Desoto was dressed 'like a mechanic' rather than being dressed 'like he owned a Jaguar or Lamborghini or high-end Mercedes' and that it was 'very

the record. The "like a mechanic" statement was made by one of the *State's* witnesses, Deputy Cooke, in response to cross-examination by defense counsel. And the part about not being dressed like someone who owned a high-end vehicle was a question by *defense counsel* during that cross-examination. The only reference Kitchens made to how Desoto was dressed was that he wasn't wearing a helmet.

### 6. Drawing an inference of racial motivation from stereotypes about motorcyclists or the Waco incident would be mere speculation.

The State has pointed to Kitchens's testimony that the motorcycle-gang incident in Waco influenced his behavior. The State contended that Kitchens "implicitly admitted that bias and stereotypes played a role in his fear of the complainant." To the extent this contention suggests that the prosecutor was permitted to comment on stereotyping Hispanics simply because Kitchens had engaged in stereotyping of *some sort*, it amounts to mere category matching. As we explained earlier, mere category matching does not involve drawing deductions, much less reasonable deductions from the evidence.

To the extent the State's contention suggests that a non-racial stereotype (such as one about motorcycle gangs) necessarily gives rise to a rational inference of prejudice against Hispanics, that contention is also mistaken. Aside from the fact that nothing in the record supports a conclusion that one stereotype (such as one about gangs) allows the inference of all other possible stereotypes, such a conclusion is simply wrong as a general matter.[46] In fact, a claim that people who engage in

---

odd' seeing 'a big, burly guy on a Harley,' which was 'not a thing you normally see pulling up to [Kitchens's] shop.'").

[46] *See Gardner v. Barnett*, 199 F.3d 915, 920-21 (7th Cir.1999) ("The conduct of voir dire is left to the trial court's sound discretion. The litigants do not have a right to have a particular question asked. *Although the Constitution does require inquiries into certain biases (such as race),*

stereotyping about gangs also engage in stereotyping about race is itself an example of unwarranted

stereotyping.[47]

---

*bias against street gangs is not among them.* Thus, Gardner had no entitlement to the questions he proposed.") (citations omitted, emphasis added); *United States v. Turner*, 104 F.3d 1180, 1184-85 (9th Cir. 1997) ("The court then considered the factors offered by the government and focused in particular on the criterion of membership in, or association with, a violent street gang. Far from being race-neutral in the court's view, this criterion, the court found, creates racial bias in the prosecutorial selections. . . . The defendants have shown no more than the consequences of the investigation of violent street gangs, not that they were targeted because of race. That such gangs should be targeted is a neutral, nonracial law enforcement decision; . . . The appellees have offered no evidence whatsoever of an intent on the part of the prosecutors to prosecute them on account of their race.") (ellipses inserted, internal quotation marks omitted); *People v. Williams*, 16 Cal. 4th 153, 279 (1997) ("Second, defendant argues that impermissible race factors affected the prosecutor's decision to seek death. Defendant suggests the prosecutor's remarks at voir dire that potential witnesses might have 'different cultural ethics,' 'different ethical values' or 'different ethnic, social, cultural, moral backgrounds' than some jurors constituted 'veiled references to racial bias.' We agree with the People that the prosecutor's references were to the gang membership or prior criminality of certain witnesses, not to their race."); *Smith v. State*, 264 Ga. 449, 450 (1994) ("The prosecutor simply inferred that the two prospective jurors were more likely to have had direct exposure to gang activity than someone who did not live in their neighborhoods. 'While this conclusion may or may not be empirically correct, we cannot say that it exhibits racially discriminatory intent as a matter of law.'").

[47] *See United States v. Taylor*, 154 F.3d 675, 681 (7th Cir. 1998) ("He apparently contends that the attribution of gang membership to him exacerbates racial biases on the grand jury, and he characterizes this challenge as one based upon principles of equal protection. He posits that when faced with 'blacks, guns and drugs,' a grand jury will necessarily indict based upon their prejudices, or that we must at least have grave doubts that they had done so. That argument is patently frivolous. Carried to its extreme, it would allow a 'free pass' from drug charges for African-American gang members, or for any other ethnic or religious minority substituted for the word 'black' above, because a grand jury could never render a fair indictment. Taylor presents no evidence that grand jurors harbor such intense prejudices, or that they are incapable of setting aside any personal biases in the interest of administering justice. He also presents no evidence correlating indictment rates to race or gang affiliation. *In fact, his argument is itself based on improper stereotypes*, and cannot transform an allegation of error in the presentation of evidence into a challenge to the structural integrity of the grand jury process. The isolated reference to the gang membership, if improper, was thus harmless in this case.") (emphasis added); *Turner*, 104 F.3d at 1185-86 ("In effect, as applied in this case, the defendants' hypothetical is an argument that the minorities of the inner city of Los Angeles must be denied the protection of law enforcement by the federal government because the likely suspects are overwhelmingly apt to be members of the minority living in that area. The defense is a grave perversion of proper sensitivity to the civil liberty of minorities. *If any policy of*

To the extent the State's contention suggests that Kitchens's reference to the Waco incident in particular reveals a racial motivation, we disagree, because nothing in the record suggests that the incident in Waco was in any way racially charged. The prosecutor could have questioned Kitchens about the Waco incident in an attempt to show a racial motivation but chose not to do so.

**7. *The record does not support the State's claim that Kitchens's articulated reasons for being concerned about or afraid of Desoto all applied to Kitchens himself or to other motorcyclists that Kitchens viewed as nonthreatening.***

The State argues that Kitchens was not that different from Desoto. They both dressed similarly, and they both operated, or had operated, motorcycles. The State also contends that Kitchens knew other people who had operated motorcycles. So, the State reasons, Kitchens's expressed concern about and fear of Desoto cannot be based on these reasons, and therefore nothing was left but Desoto's race. But as we explained earlier, Kitchens did not point to Desoto's manner of dress at all, other than to remark that he was not wearing a helmet. And Kitchens did not rely upon the mere fact that Desoto rode a motorcycle to explain the initial concern about and eventual fear of him. Instead, Kitchens articulated an initial concern about a "big, burly" stranger[48] riding a loud motorcycle without a helmet[49] who was cruising slowly around the shop looking into the bays multiple times[50] and who had no apparent reason for being interested in the shop because the shop

---

*government had a racially discriminatory effect, it would be to deny law enforcement on the grounds of a specious claim of racial discrimination.*") (emphasis added).

[48] It is undisputed that Desoto weighed approximately 100 pounds more than Kitchens.

[49] There was testimony that a loud Harley motorcycle would have varied from stock. And not wearing a helmet would evince a disregard for safety alien to someone who professionally raced motorcycles.

[50] Such activity could be viewed as possibly "casing" the establishment. *See Sandoval v. State*, 665 S.W.3d 496, 523 (Tex. Crim. App. 2022) ("The red SUV initially following the Vega

worked only on cars, not on motorcycles. And Kitchens testified to his concern escalating to fear after Desoto had come inside when Desoto used foul language, threatened to harm Kitchens, and referred to "they" in issuing a threat. These alleged facts gave a number of bases for distinguishing Desoto from Kitchens and any motorcycle-riding acquaintances Kitchens might have had. Even assuming that transparently pretextual reasons for being afraid could give rise to an inference of racial motivation (an issue we do not decide), the record does not support a conclusion that Kitchens's reasons were transparently pretextual. To the extent the State merely claims that a jury could disbelieve Kitchens's articulated reasons for concern or fear, we reject the State's claim because, "the disbelief of evidence is not evidence."[51] There has to be *evidence* from which racial motivation can be inferred.

**8. *The testimony of other witnesses did not provide a reasonable basis for deducing that the defendant harbored a racial motive.***

As we explained earlier, none of the defense witnesses testified that Kitchens harbored any bias or prejudice against Hispanics or any other racial minority. The State and the court of appeals pointed to the defense expert's testimony about "phobias," but none of that testimony supports a conclusion that Kitchens had a racial motivation for shooting Desoto. The defense expert testified about the "fight or flight" response and how it can occur in a person who overreacts to an event based on a phobia, such as a fear of spiders. But, the expert did not testify that Kitchens had a

---

family vehicles, backing away, and then returning later is consistent with casing the Vega family and the fishing site for a robbery."); *Ceniceros v. State*, 551 S.W.2d 50, 53 n.4 (Tex. Crim. App. 1977) (discussing *Terry v. Ohio*, 392 U.S. 1 (1968), where "the defendant and a companion pace[d] back and forth along an identical route, pausing to stare in the same store window, which they did for a total of about 24 times" which was characterized as "casing" the establishment).

[51] *Chavez v. State*, 666 S.W.3d 772, 777 (Tex. Crim. App. 2023).

phobia when it came to Hispanic individuals.

The court of appeals and the State also suggest that Kitchens's employees made statements showing that *they* held biases against Hispanic individuals. Our review of the record does not bear this out. The first reason Finch supplied for Desoto looking out of place was that he was on a motorcycle, and the shop did not work on motorcycles. He later suggested that Desoto looked out of place because he was "rough," but even that description is not a racial one, and he was not asked to clarify what "rough" meant. Bell said Desoto did not "look" like the typical person they dealt with, and the only detail he gave was that Desoto looked "scary and angry." But Bell wasn't asked to clarify why Desoto did not look typical. Especially given the absence of any attempt to clarify their statements, it would be mere speculation to suggest that the employees were prejudiced against Hispanics or feared Desoto because he was Hispanic.

Moreover, tarring Kitchens with the views of his employees amounts to judging guilt by association. No one asked the employees if they thought Kitchens agreed with their views of Desoto, nor was Kitchens asked if he agreed with the employees' views on why Desoto was not a typical customer. To the extent a claim of racial prejudice might turn on nuances of wording regarding why Desoto was out of place, it would be mere speculation to attribute the employees' views to Kitchens.

> **9. The prosecutor's commentary cannot be justified as merely responding to the defendant's stereotyping of "bikers" because the prosecutor clearly argued that the defendant was prejudiced against Hispanics.**

The court of appeals suggested that the prosecutor was responding to Kitchens's own expressed bias or prejudice, "whether based on Desoto's identity as a Hispanic man*, a biker, an overweight man, or some other obvious characteristic identified in the evidence.*"[52] The State picked

---

[52] *Kitchens*, 2024 WL 1313709, at *9 (emphasis added).

up this theme in its brief by saying that Kitchens "implicitly admitted that bias and stereotypes" played a role in his decision-making because of the Waco incident. We have addressed why Kitchens's reference to the Waco incident does not suggest a bias against *Hispanics*. Now we address the flip side of the coin: Kitchens clearly *did* stereotype "bikers," so we now address whether the prosecutor's closing-argument claim that Kitchens was "prejudiced" was simply a reference to *that* stereotype.

The answer is that the prosecutor explicitly conveyed to the jury that Kitchens was prejudiced against *Hispanics*, not that he was "prejudiced" as a general matter or for some other non-Hispanic reason. The prosecutor started by saying "no one has actually explicitly said it" and that "code words" are being used. Kitchens was completely open and explicit about his concern about "bikers" and his fear of motorcycle gang members, so the prosecutor's reference to something non-explicit was not a reference to Kitchens being biased against bikers. For the prosecutor, "biker" was the code word, but the characteristic the prosecutor contended it signified was *Hispanic*. The prosecutor said, "He was scary because he was a Hispanic guy. That's what they're not saying." And after the bench conference,[53] the prosecutor continued to pound the "Hispanic" theme: "The complainant was Hispanic. It's not a shock to anyone, right? You can see it in his picture." And the prosecutor continued to run with that theme when he admonished "the[m]" for using Desoto's Hispanic first name. It was after that point that the prosecutor, over defense objection, told the jury not to let "let the defendant's own prejudices become your own."

**B. The prosecutor's commentary was not a legitimate response to opposing**

---

[53] While we do not factor the bench conference into our analysis because the jury did not hear it, we would note that it confirms that Kitchens being prejudiced against *Hispanics* is *exactly* what the prosecutor was intending to convey to the jury.

**counsel.**

Although the court of appeals's "reasonable deduction from the evidence" and "response to opposing counsel" arguments were intermixed, careful parsing of its opinion suggests that it found the prosecutor's closing-argument comments to be a reasonable response to the "banditos" question asked by defense counsel in voir dire and also to be a reasonable response to the general defensive strategy in the case. In its briefing before us, the State suggested that the prosecutor's closing-argument comments were a reasonable response to the "banditos" question in voir dire and to the "outlaw biker" remark by defense counsel in closing arguments.

Notably, the actual wording of the response-to-opposing-counsel basis for permissible argument is "answer to an *argument* of opposing counsel."[54] To the extent the court of appeals relied upon the *evidence* to support its conclusion that the prosecutor's comments were a valid response to opposing counsel, that court simply rehashed the "reasonable deduction from the evidence" category of permissible arguments. And we will not countenance a so-called "answer to counsel" that waters down the requirement that any "deductions" from the evidence be "reasonable" ones.

The "argument" component of the phrase "answer to an argument of counsel" also suggests that statements of counsel *before* closing arguments should not be considered—at least if a valid objection could have been lodged.[55] We have remarked on that fact and held that improper

---

[54] *Milton*, 572 S.W.3d at 239; *Freeman v. State*, 340 S.W.3d 717, 727 (Tex. Crim. App. 2011); *Brown*, 270 S.W.3d at 570 (omitting "an"); *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973) (omitting "an").

[55] *Brown*, 270 S.W.3d at 571 (Tex. Crim. App. 2008) ("[P]roper jury argument includes answering jury argument *made by opposing counsel during the argument itself*, and does not include responding to prior cross-examination tactics used by opposing counsel during trial; the proper time to challenge such tactics is not during jury argument, but when the objectionable tactics are used. In short, the correct response to objectionable witness examination is to properly object at trial and

questioning by defense counsel is not a proper basis for a prosecutor's answer to counsel in closing argument.[56]  However, we shall assume *arguendo* that the State could not have made a valid objection to the "banditos" question.  We will also assume *arguendo* that any questioning by defense counsel at trial that the State might view as designed to emphasize Desoto's Hispanic status was too subtle to provide a proper basis for objection.  Arguably, defense counsel gratuitously mentioned Desoto's Hispanic first name when it asked Finch, "[Y]ou know his name is Hipolito Desoto, correct?"  Finch had never met Desoto before the day of the incident and would only know his name because of the pendency of the criminal prosecution.

We also repeat our earlier observation that the second defense attorney's closing argument mentioned Desoto's Hispanic first name six times—five times in conjunction with the last name, but once by itself.  To some degree, attorneys often subtly personalize their clients by using their first names or nicknames and subtly otherize persons on the opposing side by using their last names or their party designations.  The defense called the defendant "Will" or "Will Kitchens" while the prosecutors usually called the victim "Tommy."  One wouldn't be surprised if the prosecutor called the defendant "the defendant" or "Mr. Kitchens," nor would it be surprising for the defense to call the victim "Mr. Desoto."  That sort of subtle use of names and party designations is acceptable. As it was, the prosecutors often adopted the defense usage of "Will" but invariably paired it with the last name to call him "Will Kitchens."  And the prosecutors sometimes paired the victim's nickname with his last name to call him "Tommy Desoto," and on rare occasions referred to his first name,

---

correct any mis-impressions through further examination.  Thus, we are unpersuaded that the prosecutor's statements can be characterized as an answer to the argument of opposing counsel based on opposing counsel's cross-examination of witnesses.") (citation omitted, emphasis added).

[56]  *Id.*

"Hipolito," due to it being in the indictment. Although banning counsel from referring to a victim's first name would not be feasible (after all, it's his first name), perhaps the trial court could reasonably have concluded, in light of the entire trial, that counsel's use of the victim's unusual Hispanic first name was—as the prosecutor suggested—obsessive, thus allowing for the prosecutor to respond. We will assume *arguendo* that, under the totality of defense counsel's conduct in this record, the trial court would have been within its discretion to permit the State to tell the jury not to fall for any possible attempt by the defense attorneys to "otherize" the victim on the basis of his Hispanic status.

And perhaps the prosecutor's argument started off that way, though that is less than clear. The prosecutor said that "we" and "they" used code words, that "they" said the victim was scary because he was a Hispanic guy, that "they're" not saying it, and that "they" keep calling him Hipolito Desoto. With that language it was possible that the prosecutor was talking only about the defense attorneys, since there were two of them. However, the prosecutor could have been referring to the attorneys *and* the defendant. It would have been a safer to refer explicitly to the "defense attorneys."

But the prosecutor resolved any ambiguity and clearly crossed the line when he next referred to "the *defendant's* own prejudices" and said "Don't let the *defendant's* prejudices become your own." With those comments, the jury would have understood all the earlier references to "they" to have included Kitchens himself.

Even when a response to defense counsel is warranted, "a prosecutor may not stray beyond the scope of the invitation."[57] And when defense counsel injects matters outside the record, the

---

[57] *Id.* at 572 (brackets removed).

prosecutor is limited to replying "in kind."[58]  Assuming *arguendo* that defense counsel insinuated that Desoto's Hispanic status made him dangerous, the proper response to such an insinuation would have been to highlight the impropriety of a defense attorney's appeal to racial prejudice.  The *Garcia* case relied upon by the court of appeals, for example, upheld a prosecutor's statement that defense counsel's arguments were "hogwash."[59]  The prosecutor in that case referred to the attorney, not to the defendant.  While we often identify a defendant's attorney with the defendant in appellate parlance, the two are not the same, and the attorney, not the defendant, generally controls the management of the trial.[60]  Here, the prosecutor went too far when he asserted that the *defendant* himself harbored a prejudice against Hispanics.

Nor are we persuaded by the State's contention that the prosecutor's comment was a reasonable response to defense counsel's supposedly outside-the-record "outlaw biker" comment.  As we have explained earlier, when addressing reasonable deductions from the evidence, a stereotyping about motorcycle gang members does not, by itself, give rise to an inference of stereotyping Hispanics.  Even assuming defense counsel had improperly referred to Desoto as *being* an "outlaw biker" (rather than simply referring to Kitchens's *fear* that he was such), the prosecutor strayed beyond the scope of the invitation when he accused the defendant of stereotyping *Hispanics*.

---

[58]  *Bush v. State*, 773 S.W.2d 297, 301 (Tex. Crim. App. 1989).

[59]  *See* 126 S.W.3d at 925.

[60]  *See McCoy v. Louisiana*, 584 U.S. 414, 422 (2018) ("Trial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.'  Some decisions, however, are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal," and also whether to maintain one's innocence.) (citations omitted).

**III. DISPOSITION**

The trial court erred in overruling the defense objection to the prosecutor's closing-argument comment that the defendant harbored prejudice against Hispanics. The court of appeals was wrong to conclude that the comment was a reasonable deduction from the evidence, and the court was wrong to conclude that the comment was a reasonable response to defense counsel. We need not address whether the error is constitutional or non-constitutional, and we need not address the issue of harm.[61] The court of appeals can address those questions in the first instance. We reverse the judgment of the court of appeals and remand the case for a harm analysis.

Delivered: September 3, 2025

Publish

---

[61] *See* TEX. R. APP. P. 44.2.